In re RITE AID CORPORATION
SECURITIES LITIGATION.

No. MDL DOCKET NO. 1360.
Master File No. 99–1349.

United States District Court,
E.D. Pennsylvania.

June 2, 2003.

---

Douglas B. Adler, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, David J. Anderson, Bruce A. Hiler, Jeffrey W. Kilduff, William J. Stuckwisch, O'Melveny & Myers, Washington, DC, Joseph T. Baio, Rachel J. Fremmer, John R. Oller, Allison J. Ross, Michael R. Young, Richard L. Klein, Tariq Mundiya, Willkie Farr & Gallagher, New York, NY, Catherine Botticelli, Wallace L. Timmeny, Dechert Price & Rhoads, Washington, DC, John E. Caruso, John W. Frazier, IV, Montgomery, Mc Cracken, Walker & Rhoads, Philadelphia, PA, David J. Creagan, Eleanor Morris Illoway, Harkins Cunningham, Philadelphia, PA, Kelly L. Darr, David M. Howard, Dechert Price & Rhoads, Philadelphia, PA, Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, William H. Jeffress, The Warner, Washington, DC, James J. Rodgers, Kilworth, Paxson, LLP, Philadelphia PA, for defendant in No. 2:99cv01349. David J. Bershad, William C. Fredericks, Steven G. Schulman, Robert P. Sugarman, Milbert Weiss Bershad Hynes & Lerach LLP, New York, NY, Carole A. Broderick, Stuart J. Guber, Berger & Montague, P.C., Philadelphia, PA, Robert P. Frutkin, Savett, Frutkin, Podell

and Ryan, P.C., Philadelphia, PA, William E. Johnson, William E. Johnson Law Offices, Los Angeles, CA, Roger W. Kirby, New York, NY, Peter F. Marvin, Justin K. Miller, Toll, Ebby, Langer & Marvin, Philadelphia, PA, Ira M. Press, New York, NY, Sherrie R. Savett, New York, NY, for plaintiff in No. 2:99cv01349.

Dennis J. Johnson, The Law Offices of Dennis J. Johnson, South Burlington, VT, for movant in No. 2:99cv01349.

Michael J. Boni, Kohn, Swift & Graf, P.C., Philadelphia, PA, Steven Eugene Cauley, Cauley & Geller, LLP, Little Rock, AK, Laura S. Clare, Paul J. Lockwood, Steven J. Rothschild, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, J Dennis Faucher, Miller, Faucher, Chertow, Cafferty and Wexler, Philadelphia, PA, David R. Fine, Kirkpatrick and Lockhart, Harrisburg, PA, Jeffrey W. Golan, Barrack, Rodos & Bacine, Philadelphia, PA, Stephen M. Greenberg, Joel M. Silverstein, Herbert Stern, Stern & Greenberg, Roseland, NJ, Dennis J. Johnson, The Law Offices of Dennis J. Johnson, South Burlington, VT, Michael J. Kane, Liebenberg & White, Jenkintown, PA, Joel P. Laitman, Jay P. Saltzman, Samuel P. Sporn, Schoengold & Sporn, P.C., New York, NY, Roberta D. Liebenberg, Fine, Kaplan and Black, Philadelphia, PA, James E. Miller, David R. Scott, Scott & Scott, Colchester, CT, Richard J. Morvillo, Kirkpatrick & Lockhart, Washington, DC, Sherrie R. Savett, Philadelphia, PA, Scott R. Shepherd, Shepherd, Finkelman & Gaffigan, LLC, Media, PA, Jonathan Shub, Sheller, Ludwig & Badey, Philadelphia, PA, for nominal defendant in No. 2:99cv01349.

Joseph T. Baio, Rachel J. Fremmer, John R. Oller, Allison J. Ross, Michael R. Young, Richard L. Klein, Tariq Mundiya, Willkie Farr & Gallagher, New York, NY, Catherine Botticelli, Wallace L. Timmeny, Dechert Price & Rhoads, Washington, DC, John E. Caruso, Montgomery, Mc Cracken, Walker & Rhoads, Philadelphia, PA, Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, David R. Fine, Kirkpatrick and Lockhart, Harrisburg, PA, Stephen M. Greenberg, Joel M. Silverstein, Herbert Stern, Stern & Greenberg, Roseland, NJ, David M. Howard, Dechert Price & Rhoads, Philadelphia, PA, William H. Jeffress, The Warner, Washington, DC, Ivan B. Knauer, Richard J. Morvillo, Kirkpatrick & Lockhart, Washington, DC, Paul J. Lockwood, Steven J. Rothschild, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, James J. Rodgers, Kilworth, Paxson, LLP, Philadelphia PA, Andrew B. Weissman, Wilmer, Cutler & Pickering, Washington, DC, for defendant in No. 2:99cv02493.

Joel P. Laitman, Christopher Lometti, Jay P. Saltzman, Samuel P. Sporn, Schoengold & Sporn, P.C., New York, NY, for plaintiff in No. 2:99cv02493.

Harvey Greenfield, Law Firm of Harvey Greenfield, New York, NY, for Rite Aid in No. 2:99cv02493.

Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for nomdft in No. 2:99cv02493.

*MEMORANDUM*

DALZELL, District Judge.

We here consider the sequel to the partial settlement of this class action that we approved in 2001. *See In re Rite Aid Corp. Securities Litig.*, 146 F.Supp.2d 706 (E.D.Pa.2001) (*"Rite Aid I"*). The settlements before us involve those defendants who did not participate in the 2001 settlement; indeed, all but one had appealed our decision in *Rite Aid I*. The pendency of those appeals has prevented the distribution of the $193 million partial settlement that we approved two years ago.[1]

---

**1.** Thanks to nimble class counsel, this sum,     which once included securities worth $149.5

In fidelity to our duty under Fed. R.Civ.P. 23(e), we here consider the fairness of the proposed settlements between the class and defendants KPMG LLP, Timothy J. Noonan, and Martin L. Grass, whom we will collectively refer to as the "Settling Defendants". Plaintiffs also seek our approval of the dismissal of defendant Franklyn Bergonzi.

The proposed settlements total $126,641,315.00, which will be added to what is now the $207,420,598.06 held from the 2001 settlement.

The three Stipulations and Agreements of Settlement provide that KPMG will pay $125 million, and Grass will pay $1,450,000.00; Noonan remitted Rite Aid common stock that plaintiffs later sold for proceeds of $157,453.60, which now has a value, with interest, of about $157,905.00. The settlements also provide that these defendants will withdraw their appeals in *Rite Aid I*.

Having discussed at length in *Rite Aid I* the definition of the class and of the claims at issue, *id.* at 711 notes 3 and 4, we will not cover that ground again here. It will suffice to note that, during the relevant time, Grass served as Rite Aid's Chief Executive Officer, Noonan was Chief Operating Officer, and Bergonzi, Chief Financial Officer. KPMG served as independent auditors of Rite Aid's financial statements during the relevant period.

We now turn briefly to the background that led to the settlements we considered at a hearing on May 30, 2003.

*The Background of the Settlements*

While *Rite Aid I* was on appeal, class counsel engaged in protracted negotiations with KPMG that ultimately resulted in an agreement in principle in September of 2002. As the negotiations with KPMG proceeded, counsel initiated discussions with the individual defendants. Discussions achieved sufficient success that the parties agreed, on the day of the oral argument in the Court of Appeals (September 19, 2002), to ask that Court to stay further action on the appeals. The Court of Appeals therefore took no further action, pending the parties' consummation of their documents.[2]

This latter goal proved to be so elusive that on January 22, 2003 we ordered the parties to participate in a mediation before the Honorable Jacob P. Hart, United States Magistrate Judge. Judge Hart's ministrations bore fruit rather quickly with KPMG, which entered into its Stipulation and Agreement of Settlement on March 11, 2003. The resolution of issues involving Grass proved far more difficult, but as a result of Judge Hart's tireless and creative efforts, that Stipulation was entered into on April 7, 2003. The Noonan Stipulation had been entered into on December 27, 2002.

We gave preliminary approval to the KPMG and Noonan settlements, and the Bergonzi dismissal, on March 13, 2003. We gave preliminary approval to Grass's settlement on April 8, 2003.

In accordance with our Order, class counsel's administrator mailed 223,740 cop-

million, is now all cash. Seizing on an opportunity Rite Aid presented, class counsel first renegotiated what had been stock consideration into Rite Aid Notes, and then this year monetized those Notes. Thus, on February 11, 2003, Rite Aid redeemed those Notes from the class, which then received $145,754,922.60. The class also received $14,435,104 in interest on the Notes. *See* Joint Decl. of Co–Lead Counsel at ¶¶ 129–131.

**2.** The Court of Appeals panel on December 10, 2002 directed the parties to advise it each month "of the status of the settlement negotiations in these appeals." *See In re Rite Aid Corp., et al.*, Nos. 01–3546, 01–3547, 01–3562 and 01–3563 (3d Cir. Dec. 10, 2002).

ies of the notice involving the proposed settlements and dismissal. Aff. of Carole K. Sylvester at ¶ 3. These notices were mailed on April 15, 2003, and the administrator has advised us that it "caused to be mailed directly to potential Class Members or delivered in bulk to nominees an additional 90,639 envelopes containing the Notice and the Proof of Claim form." *Id.* at ¶ 6. Thus, class counsel caused to be mailed a total of 314,379 notices and proof of claim forms to all potential class members. *Id.* Also in accordance with our Order, class counsel caused a summary notice to be published in the National Edition of *The Wall Street Journal* on April 22, 2003. *Id.* at ¶ 8. Notice thus was in all respects adequate.

As of the deadline for filing objections, not one class member has filed an objection to the settlements and dismissal. The administrator has, as of May 23, 2003, "received four timely requests for exclusion and seven late requests for exclusion." *Id.* at ¶ 9.[3]

The class notice also contained the terms of the proposed Plan of Allocation. Since that Plan is the same as we approved in *Rite Aid I,* there is no point in belaboring that aspect of these settlements' implementation. Suffice it to say, the settlement fund—which includes all interest earned on the settlements, less all taxes, approved costs, fees and expenses—will be distributed to class members who file proper Proofs of Claim. Authorized claimants will receive their share of the settlement fund on a *pro rata* basis.

*Fairness Analysis*

▮ Having at length in *Rite Aid I* considered the fairness factors our Court of Appeals first identified in *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975),[4] we will not belabor them here except insofar as they involve issues unique to the new Settling Defendants.

▮ Taking the first *Girsh* factor—"complexity, expense and likely duration of the litigation"—a glance at our analysis in *Rite Aid I* demonstrates how daunting the task would have been merely for the Court of Appeals to appraise the settlement in *Rite Aid I.* In our lengthy approval of that settlement, we canvassed many issues that, on our research, were largely or entirely of first impression. Thus, it was well within the realm of possibility that the Court of Appeals could have taken exception to some of our rulings, thereby undermining *any* settlement the class might ultimately receive. On this point alone, the withdrawal of the appeals provided for in the instant settlements is of incalculable value to the class.

We also cannot ignore the complexity of the factual and legal questions remaining at issue even if the Court of Appeals affirmed *Rite Aid I* in all respects. Indeed, the moving target nature of Rite Aid's financial saga resulted in plaintiffs' counsel preparing no less than four amended com-

---

3. By the time of the hearing, there were eight tardy requests for exclusion. As no one at the hearing objected to our excusing this tardiness, we shall allow all eight exclusions in addition to the four timely ones.

4. These *Girsh* factors are: "(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining a class action through the trial ...; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery ...; and (9) the range of reasonableness of the settlement fund to a possible to a possible recovery in light of all the attendant risks of litigation."

*See also, e.g., In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001).

plaints. Counsel also incurred many hours "reviewing and analyzing hundreds of thousands of pages of documents produced by Rite Aid and KPMG, and dissecting Rite Aid's financials and the results of internal investigations." Pl'ffs' Mem. in Sup. of Final Approval of Settmts. ("Pl'ffs' Mem.") at 30.

In short, this litigation presented layers of factual and legal complexity which assured that, absent a global settlement, these disputes would take on Dickensian dimensions.

As to the second *Girsh* factor—"the reaction of the class to the settlement"—we repeat that over 300,000 notices were mailed and yet not one objection to the merits of the settlements was filed. Given the very large stock losses class members have suffered, to say nothing of the sheer number of class members, the lack of any objection can only be regarded as astonishing. This conclusion is fortified when one bears in mind the number of investors in the class who at least historically have been described as "sophisticated".[5] *See Rite Aid I,* 146 F.Supp.2d at 714. This factor thus tips very heavily in favor of a strong presumption of fairness.

Although the parties did not engage in much formal discovery—the third *Girsh* factor—there was an immense amount of informal discovery. Rite Aid's new management supplied plaintiffs' counsel with hundreds of thousands of documents and KPMG did the same. Plaintiffs' counsel also had the benefit of the results of Rite Aid's internal investigation of the prior management and accounting record. Additionally, plaintiffs' counsel "consulted with several experts on matters of account-ing, auditing, damages and investment banking", Pl'ffs' Mem. at 32.

With respect to "the risks of establishing liability"—the fourth *Girsh* factor—we cannot ignore the fact that the lion's share of the new consideration comes from Rite Aid's former auditor, KPMG. Well before Congress adopted the Private Securities Litigation Reform Act, the Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) had raised the scienter bar for accountants. Clearly, in any securities case where a plaintiff must prove that a professional acted with knowledge and/or recklessness with regard to material misstatements and omissions, a successful outcome can never be regarded as a sure thing. *See, e.g., In re IKON Office Solutions, Inc.,* 277 F.3d 658 (3d Cir.2002) (affirming summary judgment to auditors for lack of requisite scienter). Here, a jury might well find that KPMG was itself misled by Rite Aid's former management about the company's finances. Indeed, KPMG's claim that it, too, was a victim and not a perpetrator draws significant support from the fact that the Government has not indicted the firm, but indictments have been returned against Grass and Bergonzi; Noonan has already pleaded guilty.[6]

Thus, the risk of establishing liability against KPMG is sufficiently real that the $125 million from it must be regarded as a bird in the hand. The fourth *Girsh* factor therefore tips heavily in favor of this major aspect of the settlements before us.

As we did in *Rite Aid I,* 146 F.Supp.2d at 714–16, we consider *Girsh* factors five through nine together. As we pointed out

---

**5.** These include large mutual fund groups such as Vanguard and Putnam, as well as a number of statewide pension funds. Investors of this latter type have, since Congress enacted the Private Securities Litigation Re-form Act, been quite prominent and two-fisted in litigation of this kind.

**6.** Grass's and Bergonzi's criminal trials are set to begin this month in the Middle District of Pennsylvania.

in *Rite Aid I*, even assuming that the class could establish $2 billion as "actual recoverable losses", collecting such a prodigious sum from a financially responsible defendant is quite another matter. As he did in *Rite Aid I*, Professor John C. Coffee, Jr., Adolf A. Berle Professor of Law at Columbia University Law School, submitted to us a Declaration that reviews the settlements before us in detail and compares them with other securities class action settlements. As Professor Coffee demonstrates in ¶ 9 of his Declaration, KPMG's payment here constitutes the third largest settlement "ever obtained from accountants in securities class actions". Notably, "it was over three times larger than the next highest settlement that KPMG had to that point ever paid in a securities class action", that is, the $40.3 million KPMG paid in the *Mercury Finance* litigation. *Id.* at ¶ 10.

Indeed, even if the total class damages were assumed to be $3 billion—which, as Professor Coffee notes, "may be optimistic", *id* at ¶ 11—KPMG's payment is more than double the average recovery identified in the independent research Professor Coffee cites. In short, Professor Coffee's Declaration documents that this is a rich settlement as measured against the many others involving auditors that he considers in his comprehensive Declaration.

As to Messrs. Grass, Noonan and Bergonzi, we note first that class counsel have represented that Bergonzi has documented "the limited financial assets and his ability only to contribute a very small sum to a settlement." Pl'ffs' Mem. at 24. Bergonzi's situation is further complicated by the fact that he is a co-defendant with Grass in a complex criminal case soon to begin trial this month. Owing to the difficulty of exchanging releases among the parties, plaintiffs determined that even a minimal settlement with Bergonzi would not be

worth the complications it would occasion, particularly recalling that Bergonzi had taken an appeal of *Rite Aid I*. We see no reason to second guess counsel's judgment call as to Bergonzi.

With respect to Grass, he is, as noted, the subject of a criminal indictment the United States Department of Justice obtained. Grass is also subject to possible further action by the Securities and Exchange Commission. Under these circumstances, the civil class action against Grass, serious as it is, constitutes the least of his present worries. He therefore had little motivation to contribute serious funds to settle this matter. Under these circumstances, a seven-figure settlement with Grass, while something of a bargain to him, is nevertheless another judgment call that, to us, seems reasonable, especially as Grass will, as part of his deal, withdraw his *Rite Aid I* appeal.

Noonan's financial circumstances were not much better than Bergonzi's. Noonan faces sentencing in his federal criminal case, having pleaded guilty on July 10, 2002 to a criminal information that charged him with misprison of felony in violation of 18 U.S.C. § 4.[7] His contribution to the settlement was in the form of Rite Aid stock, which has been liquidated. Plaintiffs' counsel have represented that this was the most that could be realistically recovered from Noonan; we accept the Noonan contribution as a reasonable compromise.

Balancing all of the *Girsh* factors, we without hesitation find the settlements to be fair and reasonable under all of the circumstances. We therefore will enter Orders, accompanying this Memorandum, approving the settlements with KPMG, Grass and Noonan, and dismissing the action against Bergonzi.

---

**7.** It has been reported that Noonan is expected to testify against Grass and Bergonzi.

*Counsel Fees*

In their fee requests for these latest settlements, class counsel follow the template we approved in *Rite Aid I, see* 146 F.Supp.2d at 734–36. Specifically, these counsel—who undertook their representation on a fully-contingent basis—seek 25% of the settlement fund, or $31,660,328, plus reimbursement of out-of-pocket litigation expenses of $290,086. This request has prompted two objections from the over–300,000 notice recipients.

■ As we did in *Rite Aid I*, we have found Professor Coffee's Declaration to be most helpful in appraising the reasonableness of the present fee request against the factors our Court of Appeals established in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000) and *In re Prudential Ins. Co.*, 148 F.3d 283, 336–40 (3d Cir.1998).[8] Although we agree with Professor Coffee that, notwithstanding our action in *Rite Aid I*, "there should not be any automatic presumption that a 25% fee request is appropriate", Decl. at ¶ 18, all the evidence here points to the reasonableness of this percentage.

Looking at securities settlements involving $10 million or more, Professor Coffee found fifty-five with an average percentage recovery of slightly over 31%. *See id.* at ¶ 20. Referring to a Federal Judicial Center study of "all class actions resolved or settled over a two year period in four selected federal district courts", including this one, median rates "range from 27% to 30%". *Id.* at ¶ 22.

In ¶ 25 of his Declaration, Professor Coffee lists twenty-four "mega fund" class action settlements over the last decade. Professor Coffee defines a "mega fund" case as one where the settlement exceeded $50 million. On settlements of between $100 million and $200 million, Professor Coffee finds that "the 25% to 30% fee range still seems fairly standard", *id.* at ¶ 26.

In the face of this obvious reasonableness of the percentage sought here, we also think it bears repeating that only two class members have filed objections to the fees sought. As Professor Coffee notes, "[t]his low a level of objectors is a rare phenomenon—especially in a case where 300,000 notices were mailed." *Id.* at ¶ 39(d).[9]

---

**8.** We summarized this jurisprudence in *Rite Aid I*, 146 F.Supp.2d at 734–35.

**9.** These objections, by Melvin R. Oake (said to have bought 800 shares of Rite Aid stock) and Walter Kaufmann (who may own 500 shares), are frivolous. Mr. Oake makes the wholly imaginary claim that class counsel spent "very little time ... discovering what went wrong." In fact, these counsel were at least six months ahead of Rite Aid's Board of Directors, and eighteen months ahead of the Government, in discovering the conduct that will be the focus of a complex criminal trial this month. Class counsel incurred almost 13,000 hours post-*Rite Aid I*—all documented in their Compendium submitted to us—that give the lie to Mr. Oake's unwarranted canard.

Mr. Kaufmann's objection seems to be another vehicle for a professional gadfly, Law- rence W. Schonbrun, Esq., to become a twelfth-hour squeaky wheel. He makes the extravagant statement that the *Cendant PRIDES* decision, *infra*, represented a tectonic shift that ended double digit fee percentages forever. He ignores, *inter alia*, the fundamental distinction that *Cendant PRIDES* involved a case where settlement was quick and both Cendant's liability and ability to pay *any* judgment "had been conceded at the outset" *Cendant PRIDES*, 243 F.3d at 741. As we held in *Rite Aid I* and above, all issues of liability were here contested, Rite Aid teetered on the brink of bankruptcy, and KPMG's proportionate liability (assuming it had any) could well have been quite small. The Kaufmann–Schonbrun contention thus constitutes the purest fancy, and deserves no further comment.

In *Rite Aid I*, we repeatedly stressed the reasonableness of the settlement, and of the 25% fee, given Rite Aid's precarious financial situation as attested by its New York Stock Exchange market price. *See* 146 F.Supp.2d at 715–16. While KPMG is, clearly, in far better financial health, the collapse of Arthur Andersen demonstrates that, as Professor Coffee notes, "auditors can go out of business". *Id.* at ¶ 39(f).

At the risk of belaboring the obvious, we pause to say a specific word about the third *Gunter–Prudential* factor, "the skill and efficiency of the attorneys involved." Co-lead counsel here—Berger & Montague, P.C. and Milberg Weiss Bershad Hynes and Lerach LLP—were extraordinarily deft and efficient in handling this most complex matter. As we mention in note 9 above, they were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. Their attention to detail was such that when Rite Aid's financial concerns led to its willingness to consider renegotiating the non-cash portion of the *Rite Aid I* settlement, counsel—aided by investment advisors Wilber Ross and Bear Stearns—ultimately monetized the entire settlement and gained the class interest of $14,435,104 when interest rates were the lowest they have been in over forty years. In short, it would be hard to equal the skill class counsel demonstrated here.

Finally, performing a lodestar cross-check, as our Court of Appeals has suggested, *see, e.g., In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir.

2001), we find a lodestar multiplier of 4.07.[10] While this is certainly a handsome premium, as Professor Coffee points out, "[m]ultipliers in this range are fairly common." *Id.* at ¶ 42. In any event, as the lodestar approach is merely a cross-check, and the percentage of recovery method being the preferred approach, *see In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir.2001), we find the fee request to be in all respects reasonable under the *Gunter–Prudential* factors and will therefore approve it.

No one has questioned the request for reimbursement of out-of-pocket expenses, and we find nothing in any way eyebrow-raising about the components of the $290,086.14 sought. We therefore approve that reasonable request.

Accompanying this Memorandum is a separate Order embodying these approvals.

*Conclusion*

With our approval of these settlements and dismissal, the appeals in *Rite Aid I* will be, as noted, withdrawn. This means that the global settlement of over $334 million will, at long last, be available for payment to class members who have waited a long time since Rite Aid suffered the reversals that have wrought such havoc on its stock price. In the end, the very fact of this finality, at the end of so long a saga, constitutes further reason why our approval is in the best interest of this very large class.

We salute able counsel on both sides, as well as our colleague, Judge Hart, for bringing to an end a most complex litiga-

---

**10.** This takes 12,906 hours incurred since the fee application in *Rite Aid I* and uses a top hourly rate that blends the rates of the senior-most lawyers at the firms of co-lead counsel. If one were to exclude the time incurred in the *Rite Aid I* appeal and the monetization of that settlement, the lodestar multiplier would be 4.6. Given that the settlements here bring the finality that was lacking to *Rite Aid I*, it would be artificial to act as if these settlements and *Rite Aid I's* were of no relevance to each other, and thus we believe 4.07 is the fairer multiplier.

tion in a manner that well serves the interests of so many Rite Aid investors.

*FINAL ORDER APPROVING PLAINTIFFS' COUNSEL'S JOINT PETITION FOR AN AWARD OF FEES AND REIMBURSEMENT OF EXPENSES*

AND NOW, this 2nd day of June, 2003, upon consideration of all information and argument submitted with respect to the motion of plaintiffs' counsel for an award of attorneys' fees and reimbursement of expenses, including review of Plaintiffs' Counsel's Memorandum in Support of Motion For Award of Attorneys' Fees and Reimbursement of Expenses, the Joint Declaration of Co-Lead Counsel in Support of Proposed Class Settlements and Joint Petition For an Award of Fees and Reimbursement of Expenses, Plaintiffs' Compendium of Law Firm Affidavits, the letter of Melvin R. Oake (treated as an objection), the objection of Walter Kaufmann, and after a hearing held on May 30, 2003 following notice to the Class regarding, among other things, the proposed settlements with KPMG LLP. Grass and Noonan, and the intended application for attorneys' fees and expenses, and for the reasons set forth in our Memorandum of this day, it is hereby ORDERED that:

1. The objections of Melvin R. Oake and Walter Kaufmann are OVERRULED;

2. The motion is GRANTED;

3. Plaintiffs' counsel are awarded attorneys' fees in the amount of $31,660,328 (the "Fee Award"), which constitutes twenty-five percent of the Settlement Fund of $126,641,315;

4. Plaintiffs' counsel are awarded reimbursement for expenses incurred in the prosecution and settlement of this action in the amount of $290,086 ("Expense Award");

5. Plaintiffs' counsel are further awarded interest on the Fee Award and the Expense Award at the same rate as earned by the Settlement Fund from May 30, 2003 through the date of payment; and

6. There is no just reason for delay in the entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the Clerk is hereby directed to enter judgment in accordance with this Order.