

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-26-2005

# In Re: Rite Aid Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-2914

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re: Rite Aid Corp " (2005). *2005 Decisions*. Paper 1529.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1529

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2914

———————

IN RE: RITE AID CORPORATION
SECURITIES LITIGATION

Plaintiff Class Member/Objector Walter Kaufmann,

———————                    Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. MDL No. 10-md-01360 and
D.C. Civil Action No. 99-cv-01349
(Honorable Stewart Dalzell)

———————

Argued May 27, 2004
Before: SCIRICA, *Chief Judge*,
FISHER and ALARCÓN[*], *Circuit Judges*

(Filed: January 26, 2005)

———————

[*]The Honorable Arthur L. Alarcón, United States Circuit
Judge for the Ninth Judicial Circuit, sitting by designation.

LAWRENCE W. SCHONBRUN, ESQUIRE (ARGUED)
86 Eucalyptus Road
Berkeley, California 94705
        Attorney for Appellant

SHERRIE R. SAVETT, ESQUIRE (ARGUED)
ROBIN SWITZENBAUM, ESQUIRE
CAROLE A. BRODERICK, ESQUIRE
Berger & Montague
1622 Locust Street
Philadelphia, Pennsylvania 19103

DAVID J. BERSHAD, ESQUIRE
Milberg Weiss Bershad & Schulman
One Pennsylvania Plaza, 48th Floor
New York, New York 10119
        Attorneys for Appellees,
        John Tang, Joan Vorpahl, Haim Aybar,
        Ronald Tunney and Steve Couture

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

At issue is whether the District Court abused its discretion in assessing the reasonableness of attorneys' fees

2

requested by class counsel in a § 10(b) securities class action. In all respects but one, the trial judge performed an exemplary analysis. But this factor requires that we vacate and remand.

## I.

This is an appeal in the Rite Aid Corporation securities litigation, filed under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* Class counsel in this complex § 10(b) class action were successful in obtaining a settlement of $126.6 million from outside auditors KPMG LLP and former executives of Rite Aid. The KPMG settlement was one of the highest ever obtained from an accounting firm in a securities class action and resulted in the withdrawal of appeals from the previously negotiated $193 million Rite Aid settlement.

The District Court awarded class counsel, consisting of co-lead counsel Berger & Montague, P.C., Milberg Weiss Bershad & Lerach LLP and other firms representing the class, $31.6 million or 25% of the KPMG settlement fund. The trial judge, who presided over both the Rite Aid and KPMG settlements, believed "it would be hard to equal the skill class counsel demonstrated here." *In re Rite Aid Corp. Secs. Litig.*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003) ("*Rite Aid II*"). The class appeared to agree. Only two of the more than 300,000 class members objected to the fee award. Moreover, studies of comparable cases confirmed the requested fee percentage was within a reasonable range. For those reasons, the District Court denied objector and unnamed class member Walter Kaufmann's

3

challenge to the requested fee award of $31.6 million.  *Id.* at 610-12.

Facts

In the course of the litigation, there were two distinct, but inter-related settlements—one with Rite Aid as the primary defendant, *see In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) ("*Rite Aid I*"), and one with KPMG as the primary defendant.  *See Rite Aid II*, 269 F. Supp. 2d 603.  The fee award in *Rite Aid II* is under review, but *Rite Aid I* provides the necessary context, so we detail it briefly.

### 1.  Rite Aid I

The Rite Aid litigation commenced after public disclosures of disappointing earnings and a resulting drop in Rite Aid's share price on March 12, 1999.  Thirty-six law firms filed class actions against Rite Aid, its officers and directors, alleging, *inter alia*, violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Eventually on October 11, 1999, Rite Aid announced that its 1997, 1998, and 1999 financial statements could no longer be relied upon, resulting in a reduction of Rite Aid's previously reported pre-tax earnings.

In June 1999, the trial court appointed lead plaintiffs for the class and approved their selection of class counsel.  The court also permitted the class to add Rite Aid's outside auditor, KPMG, as a defendant.  The complaint alleged Rite Aid published materially false financial statements, which KPMG

4

erroneously stated were in accordance with generally accepted accounting principles. After the suit was filed, the Department of Justice began its own investigation of Rite Aid's accounting practices which, eighteen months later, resulted in criminal indictments against some Rite Aid officers. The Securities and Exchange Commission also commenced an investigation of KPMG, although no criminal or civil charges were ever brought.

In December 2000, class counsel negotiated a $193 million cash and non-cash settlement with Rite Aid.[1] The settlement included Rite Aid and all its former officers and directors except former Chief Executive Officer Martin L. Grass, former Chief Operating Officer Timothy J. Noonan, and former Chief Financial Officer Frank M. Bergonzi. The settlement reserved claims of the class and of Rite Aid against Grass, Noonan, and Bergonzi, as well as against KPMG.

The notice of settlement, disseminated to 300,000 potential class members, advised that class counsel would seek attorneys' fees up to 33⅓% of the total recovery. There were no objections to the fee request. At the settlement fairness hearing,

---

[1]Initially, this sum included a cash payment of $43.5 million and securities valued at $149.5 million. Class counsel converted the securities to cash by renegotiating what had been stock into Rite Aid Notes and then monetizing the Notes. On February 11, 2003, Rite Aid redeemed the Notes from the class for $145.75 million. The class also received $14.44 million in interest on the Notes. The settlement value has now increased to $207 million.

5

class counsel petitioned for a reduced fee award of 25% of the total recovery. In June 2001, the District Court approved the settlement and a fee award of 25%, or $48.25 million. *See Rite Aid I*, 146 F. Supp. 2d at 734-37.

### 2. *Rite Aid II*

In September 2001, defendants KPMG and non-settling former Rite Aid officers appealed the *Rite Aid I* settlement, contending a provision of the settlement barring claims by non-settling parties against the settling defendants was overbroad. The appeal effectively halted distribution of the $193 million partial settlement to class members. Class counsel commenced protracted settlement negotiations with KPMG and the non-settling officers in early to mid-2002. These negotiations culminated in the signing of a memorandum of understanding with KPMG in September 2002 and with the non-settling officers immediately before scheduled oral argument on the *Rite Aid I* appeal on September 19, 2002. Concluding the settlement, however, proved difficult. In January 2003, the District Court ordered the parties to participate in mediation, which culminated in KPMG entering into a Stipulation and Agreement of Settlement on March 11, 2003.[2]

---

[2]Grass entered into a Stipulation and Agreement on April 7, 2003. Noonan entered into a Stipulation and Agreement on December 27, 2002. Class Counsel dismissed Bergonzi as a defendant because they "determined that even a minimal settlement with Bergonzi would not be worth the complications

6

On March 13, 2003 and April 8, 2003, the District Court gave preliminary approval to the settlements which included cash payments of $126.6 million[3] and withdrawal of all appeals in *Rite Aid I*.  Notice of the settlement was mailed to 300,000 class members, advising that class counsel would request a fee of 25% of the settlement fund.  No class members objected to the settlement, but two members, including Kaufmann, objected to the fee request.

Following a fairness hearing on May 30, 2003, the District Court overruled the objections and approved the settlement and fee request.  *See Rite Aid II*, 269 F. Supp. 2d at 610-12.  Applying the factors announced in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the District Court found the proposed settlement to be "fair and reasonable under all of the

---

it would occasion[.]"  *Rite Aid II*, 269 F. Supp. 2d at 609.

Grass and Bergonzi ultimately pled guilty to charges of criminal conspiracy to defraud.  *See Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 672 (E.D. Pa. 2004).  Noonan pled guilty to a criminal information that charged him with misprison of felony in violation of 18 U.S.C. § 4.  *See Rite Aid II*, 269 F. Supp. 2d at 609.

[3]The settlement provided KPMG would pay $125 million, Grass would pay $1.45 million, and Noonan would remit Rite Aid common stock, which plaintiffs later sold for $157,453.60.  *Rite Aid II*, 269 F. Supp. 2d at 606.

circumstances." *Rite Aid II*, 269 F. Supp. 2d at 609. With respect to class counsel's fee request, the court found the declaration of Professor John C. Coffee, class counsel's attorneys' fees expert, "most helpful" in assessing the fee request's reasonableness against "the factors . . . established in *In re Prudential Ins. Co.*, 148 F.3d 283 (3d Cir. 1998) and *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000)." *Rite Aid II*, 269 F. Supp. 2d at 610. Relying on Professor Coffee's findings, the court noted that statistical data from other class action settlements demonstrated: (1) an average percentage recovery of 31% in securities class actions involving settlements greater than $10 million; (2) a range of median rates from 27% to 30% over the course of a two year period in selected federal district courts; and (3) percentage recoveries between 25% to 30% were "fairly standard" in "mega fund" class actions involving settlements between $100 and $200 million. *Id.* The court also found significant that only two class members objected to the fee amount and noted class counsel bore a risk of nonpayment in the event KPMG went out of business. *Id.* at 610-11. The court found class counsel's skill and efficiency in obtaining the settlement weighed in favor of approving the fee request, finding class counsel to be "extraordinarily deft and efficient in handling this most complex matter" and concluding "it would be hard to equal the skill class counsel demonstrated here." *Id.* at 611. Performing a lodestar cross-check to confirm the fees' reasonableness, the court found a "handsome," yet "fairly common" lodestar multiplier of 4.07

8

based upon 12,906 hours billed since the fee application in *Rite Aid I* at an hourly rate of $605. *Id.* at 611 and n.10.

For those reasons, the District Court denied Kaufmann's objections and awarded class counsel the requested fees plus reimbursement of out-of-pocket litigation expenses in the amount of $290,086. *Id.* at 611-12.

Kaufmann filed this timely appeal.[4] He objects to the fee award, contending the District Court abused its discretion by awarding class counsel an unreasonable common fund percentage fee and failed to follow the proper standards for assessing attorneys' fees. He also contends the District Court violated the class's rights to Fifth Amendment Due Process and to adequate representation under Fed. R. Civ. P. 23 by failing to appoint a guardian or fee award expert to counter class counsel's expert declaration supporting their fee contention.

Although an unnamed class member, Kaufmann has standing to appeal, without first intervening. *See Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002) (holding that unnamed class members who object in a timely manner to approval of a settlement at a fairness hearing may appeal without first intervening); *See also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1307 (3d Cir. 1993) (holding that an unnamed plaintiff that did not intervene nonetheless had standing to appeal a class action settlement). The 2003 Amendment to Fed. R. Civ. P. 23

---

[4]We have appellate jurisdiction under 28 U.S.C. § 1291.

added subsection (e)(4)(A), which allows "[a]ny class member" to "object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A)."

## II.

"[A] thorough judicial review of fee applications is required for all class action settlements." *Prudential*, 148 F.3d at 333 (internal quotations omitted). We review the District Court's attorneys' fees award for abuse of discretion "which can occur if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001) (internal quotations omitted). The standards employed calculating attorneys' fees awards are legal questions subject to plenary review, but "[t]he amount of a fee award . . . is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *Pub. Interest Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1184 (3d Cir. 1995) (internal quotations omitted). The appointment of an expert to assist a district court in the performance of its duties is governed by Fed. R. Evid. 706 which provides a court "may appoint expert witnesses of its own selection,"[5] and is reviewable under an abuse of discretion

---

[5]Fed. R. Evid. 706(a) provides:

The court may on its own motion or on the motion

standard. *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1070-71 (9th Cir. 1999).

## III.

Kaufmann challenges the District Court's conclusion that the $31.6 million fee request on the $126.6 million *Rite Aid II* settlement was reasonable. He contends the District Court erred in assessing the fees' reasonableness under our jurisprudence

of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

11

governing fee awards and should have applied a declining percentage "sliding scale" principle to reduce the percentage-of-recovery to account for the magnitude of the settlement fund. He also contends the District Court erred in calculating the lodestar cross-check multiplier using the hourly rates of the most senior lawyers on the case.

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for failure." *Prudential*, 148 F.3d at 333 (internal quotations omitted). The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to "reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation" or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method. *Id.* Regardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation.[6] *Id.*

_____

[6]The Manual For Complex Litigation (Fourth) § 14.122 (2004) also suggests "the lodestar is at least useful as a cross-check . . . using affidavits and other information provided by the

12

Consistent with past jurisprudence, the percentage-of-recovery method was incorporated in the Private Securities Litigation Reform Act of 1995. 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.").[7] Nonetheless, we do not believe the Private Securities Litigation Reform Act precludes the use of the lodestar method as a check on the percentage-of-recovery calculation.[8]

---

fee applicant."

[7]It bears noting that Rule 23 was amended in 2003 to provide explicit authority to award "reasonable attorney fees" in class actions. *See* Fed. R. Civ. P. 23(h) ("In an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law[.]"); Fed. R. Civ. P. 23(h), 2003 Advisory Committee Notes. The Advisory Committee Notes to the 2003 Amendments state that "[o]ne fundamental focus is the result actually achieved for class members" and that the "Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies."

[8]The legislative history is ambiguous. The Joint Explanatory Statement of the Committee of Conference in the House Conference Report explains that the "Conference Committee

Notwithstanding our deferential standard of review of fee determinations, we have required district courts to clearly set forth their reasoning for fee awards so that we will have a sufficient basis to review for abuse of discretion. *See Prudential*, 148 F.3d at 340; *Gunter*, 223 F.3d at 196; *Cendant PRIDES*, 243 F.3d at 733. A district court should consider seven factors when analyzing a fee award in a common fund case:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of

does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated." H.R. Conf. Rep. 104-369, at 36 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 735. But, compare the statement of Senator Christopher Dodd: "The conference report puts an end to this outrageous practice, called the 'lodestar' approach, by encouraging courts to award attorney's fees based upon a reasonable percentage of the total amount of the settlement or judgment." 141 Cong. Rec. S17933-04, S17597 (daily ed. Dec. 5, 1995) (statement of Sen. Dodd).

nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d at 195 n.1 (citing *Prudential*, 148 F.3d at 336-40; *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819-22 (3d Cir. 1995)); *Cendant PRIDES*, 243 F.3d at 733; *In re Cendant Corp. Litig.*, 264 F.3d 201, 283 (3d Cir. 2001).[9]

These fee award factors "need not be applied in a formulaic way . . . . and in certain cases, one factor may

---

[9]In *Cendant PRIDES*, we explained "the principles enunciated in *Gunter* have been announced by this court before" in *Prudential* and *GMC*. *Cendant PRIDES*, 243 F.3d at 735 n.17. The fee award factors are similar to the factors established in *Girsh*, 521 F.2d 153, that we use to assess class action settlements. The *Girsh* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* at 157.

outweigh the rest." *Gunter*, 223 F.3d at 195 n.1. In cases involving extremely large settlement awards, district courts may give these factors less weight. *See Prudential*, 148 F.3d at 339; *Cendant*, 264 F.3d at 283. In *Cendant PRIDES*, 243 F.3d 722, we held that on the facts of that case, the most important factors were the "awards in similar cases" and the "complexity and duration" of the litigation. *Id.* at 735.[10]

In making its fee determination, the District Court analyzed the requested fees under the factors outlined in *Prudential* and *Gunter*. *Rite Aid II*, 269 F. Supp. 2d at 610-11. But its fee analysis was somewhat abbreviated, undoubtedly because the District Court addressed similar issues in its examination of the settlement's fairness under the *Girsh* factors in *Rite Aid II*, *id.* at 607-09, and previously, in a similar fee award analysis in *Rite Aid I*, 146 F. Supp. 2d at 734-36. Though concise, the District Court's analysis nonetheless provides a sufficient basis for us to adequately review its award. That said, we remind the trial courts to engage in robust assessments of the fee award reasonableness factors when evaluating a fee request. *See Prudential*, 148 F.3d at 340 (remanding fee award determination "[b]ecause the district court's basis for, and

---

[10]In *Cendant*, 264 F.3d 201, we noted, under the Private Securities Litigation Reform Act, the aim of the fee award analysis "is not to assess whether the fee request is reasonable," but "to determine whether the presumption of reasonableness has been rebutted." *Cendant*, 264 F.3d at 284.

16

calculation of, the appropriate fee percentage was unclear in light of the facts and cases it referenced, and because it should set forth a reasoned basis and conclusion regarding the proper percentage"); *Gunter*, 223 F.3d at 196 (stating "if the district court's fee-award opinion is so terse, vague, or conclusory that we have no basis to review it, we must vacate the fee-award order and remand for further proceedings"); *Cendant PRIDES*, 243 F.3d at 735 (remanding for reevaluation of fee award where the district court "brushed over our required analysis" of the fee award factors and failed to make "its reasoning and application of the fee-awards jurisprudence clear") (internal quotations omitted). We reiterate that the proper standard of review is abuse of discretion.

### A. Size of the Fund

The District Court found the size of the fund weighed in favor of approving the requested attorneys' fees.[11] In discussing

---

[11]Kaufmann contends we should assess the aggregate $334 million settlement fund created by the *Rite Aid I* and *Rite Aid II* settlements. Class counsel respond we should consider only the $126.6 million from the *Rite Aid II* settlement. Even though the settlement in *Rite Aid II* resulted in the termination of the *Rite Aid I* appeal, these are separate settlements, involving distinct legal issues and risks with which class counsel had to contend. The *Rite Aid I* settlement resulted in a recovery of $193 million with a fee award of $48.25 million. That fee award is not under review. Accordingly, we will not conflate the two distinct

17

the settlement agreement's merits in its *Girsh* analysis, the court noted this was a "rich settlement as measured against the many others involving auditors" and recognized the settlement to be the third largest ever obtained from an accounting firm in a securities class action. *Rite Aid II*, 269 F. Supp. 2d at 609.

Kaufmann, however, argues the District Court overemphasized the importance of the fund's size, ignoring that the "size of the fund" factor should receive less weight in "mega fund" cases. Kaufmann contends the court should have applied a declining percentage "sliding scale" reduction in which fee awards decrease with the size of the settlement. He cites *Prudential*, in which we agreed with the district court's reduction of the percentage due to the size of the fund, explaining "[t]he basis for this inverse relationship is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." 148 F.3d at 339 (internal quotations omitted).

Our jurisprudence confirms that it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries. *See Cendant*, 264 F.3d at 284 (noting "several of [our] cases have stated that, ordinarily, the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall

settlements and will consider only the reasonableness of the attorneys' fees based on the *Rite Aid II* settlement.

18

settlement or recovery increases").[12]  But there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund.  Put simply, the declining percentage concept does not trump the fact-intensive *Prudential/Gunter* analysis.  We have generally cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees. *See Cendant PRIDES*, 243 F.3d at 736 ("[A] district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case.").

Moreover, *Prudential* does not mandate application of the declining percentage sliding scale.  In *Prudential*, we stated the reason courts apply the declining percentage principle "is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to

---

[12]We have recognized criticism of the declining percentage principle:

> Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.

*Cendant*, 264 F.3d at 284 n.55.

19

the efforts of counsel." 148 F.3d at 339 (internal quotations omitted). In vacating the fee award of $90 million on a settlement estimated at $1 billion, *id.* at 338-40, much of our concern was case specific. In particular, we questioned such a sizable fee award when much of the settlement apparently resulted from the work of state regulators and a multi-state insurance task force. *See id.* at 342. Here, in contrast, the District Court found class counsel's "extraordinarily deft and efficient" handling of this complex § 10(b) matter resulted in a "rich settlement." *Rite Aid II*, 269 F. Supp. 2d at 609-11. In short, the court found class counsel's efforts played a significant role in augmenting and obtaining an immense fund. The court did not abuse its discretion in declining to apply a "sliding scale" reduction, nor in viewing the size of the fund to be a factor weighing in favor of approval of the fee request.

### B.  Awards in Similar Cases

In comparing this fee request to awards in similar cases, the District Court found persuasive three studies referenced by Professor Coffee: one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard." *Id.* at 610. We see no abuse of discretion in the District Court's reliance on these studies.

20

Kaufmann cites to certain decisions in which courts have found lower percentages or ratios in large fund cases. But most of the cases identified by Kaufmann are easily distinguishable. Citing *Cendant PRIDES*, he points out that our suggested lodestar multiplier of 3 – a multiplier tied to the facts of that case – falls below the cross-check lodestar multiplier here of 4.07. *Cendant PRIDES*, however, "was neither legally nor factually complex" and the "duration of the case from the filing of the Amended Complaint to the submission of a Settlement Agreement to the District Court was only four months." 243 F.3d at 742-43.

In *Cendant PRIDES*, the attorneys for the plaintiffs' class filed a complaint "accompanied by a motion for class certification, a motion for summary judgment, and a motion for preliminary injunctive relief" and "[l]ess than two months later . . . the parties announced that they had reached" an agreement in principle. 243 F.3d at 735. Because this occurred "very early on in the litigation," "discovery was virtually nonexistent" and counsel only spent approximately 5,600 hours on the action. *Id*. at 735-36. In addition, "the case was relatively simple in terms of proof, in that Cendant had conceded liability and no risks pertaining to liability or collection were pertinent[.]" *Id.* at 735. Moreover, "there was a minimal amount of motion practice" in Cendant PRIDES – "before settlement, [counsel] submitted only the Complaint and three motions, all on the same day[.]" *Id*. at 735-36. These factors are absent in this case. We find no abuse

21

of discretion in the District Court's comparison of this fee request to awards in other cases.

### C. Risk of Nonpayment

In assessing the risk of non-payment in its fee award analysis, the District Court stated that while KPMG was "in far better financial health" than Rite Aid, "the collapse of Arthur Andersen demonstrates that . . . auditors can go out of business." *Rite Aid II*, 269 F. Supp. 2d at 611 (internal quotations omitted). Moreover, the District Court made several significant findings in assessing the "risks of establishing liability" under the *Girsh* analysis that affect the risk of non-recovery. Because § 10(b) requires proof that an accounting professional acted with knowledge and/or recklessness, the court noted "a successful outcome can never be regarded as a sure thing." *Id.* at 608. The court explained "a jury might well find that KPMG was itself misled by Rite Aid's former management"—a finding supported by the fact "the Government has not indicted the firm, but indictments have been returned against Grass and Bergonzi." *Id.* The court did not abuse its discretion in finding there were significant risks of non-payment or non-recovery, which weighs in favor of approving the fee request.

### D. Class Counsel's Skill and Efficiency

The District Court, which supervised the litigation since its inception and was intimately familiar with class counsel's performance, found the skill and competence of the attorneys weighed in favor of approving the requested fee award, noting

22

class counsel "were extraordinarily deft and efficient in handling this most complex matter." *Id.* at 611. Specifically, the court stated:

> [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. Their attention to detail was such that when Rite Aid's financial concerns led to its willingness to consider renegotiating the non-cash portion of the Rite Aid I settlement, counsel—aided by investment advisors Wilber Ross and Bear Stearns—ultimately monetized the entire settlement and gained the class interest of $14,435,104 when interest rates were the lowest they have been in over forty years. In short, it would be hard to equal the skill class counsel demonstrated here.

*Id.*

Kaufmann contends attributing to class counsel the skill which enabled the class to obtain cash instead of securities and to receive a higher than money market rate of interest on the recovery, overlooks the role played by the expert investment advisors. But class counsel deserve credit for the role they played in directing the financial advisors. Kaufmann also

23

contends the government investigation, as opposed to any action by class counsel, ultimately caused KPMG to settle. But the government's investigations never resulted in criminal or civil charges against KPMG and, as class counsel note, this may have hardened KPMG's bargaining position. We see no abuse of discretion in the District Court's findings and its weighing this factor in favor of approving the requested fee percentage.

### E. Complexity, Duration, and Time-Consuming Nature of the Litigation

In assessing the "complexity, expense and likely duration of the litigation" under the *Girsh* factors, the District Court found the "litigation presented layers of factual and legal complexity which assured that, absent a global settlement, these disputes would take on Dickensian dimensions." *Id.* at 608. The court noted class counsel "incurred many hours reviewing and analyzing hundreds of thousands of pages of documents produced by Rite Aid and KPMG, and dissecting Rite Aid's financials and the results of internal investigations." *Id.* (internal quotations omitted). Furthermore, the court noted "the moving target nature of Rite Aid's financial saga resulted in plaintiffs' counsel preparing no less than four amended complaints." *Id.* at 607. Moreover, the court noted the litigation took several years, and the stipulation of settlement came about only with the assistance of mediation. *Id.* at 606. Also significant was the § 10(b) scienter requirement, which the District Court recognized may have been difficult to prove against outside auditors. *See id.* at 608.

24

Given the complexity of the accounting matters at issue, the volume of documents, the shifting factual sands that required several amended complaints, the difficulties in proving scienter against an outside auditor, the duration of the litigation, and the necessity of resorting to mediation to reach a final settlement, we see no abuse of discretion in the District Court's finding the matter was a complex one.

### F.  Absence of Substantial Objections by Class Members

The class's reaction to the fee request supports approval of the requested fees.  Notice of the fee request and the terms of the settlement were mailed to 300,000 class members, and only two objected.  We agree with the District Court such a low level of objection is a "rare phenomenon."  *Id.* at 610.  Moreover, as the court noted, a significant number of investors in the class were "sophisticated" institutional investors that had considerable financial incentive to object had they believed the requested fees were excessive.  *Id.* at 608 and n.5.  The District Court did not abuse its discretion in finding the absence of substantial objections by class members to the fee requests weighed in favor of approving the fee request.

### G.  Lodestar Cross-Check

In addition to the percentage-of-recovery approach, we have suggested it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method. *Prudential*, 148 F.3d at 333.  Here, it was proper for the District Court to apply the percentage-of-recovery method, with an

25

abridged lodestar analysis serving as a cross-check. The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. The multiplier[13] is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work. *See, e.g., Report of the Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237, 243 (1985). The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case." *Prudential*, 148 F.3d at 340-41.

Here, the District Court approved a lodestar cross-check multiplier of 4.07, using an average hourly billing rate of $605, the combined hourly rates of the senior-most partners at lead co-counsel firms, and 12,906 billed hours from the time the first appeal was filed in *Rite Aid I*. *Rite Aid II*, 269 F. Supp. 2d at 611 and n.10. Kaufmann contends the District Court improperly applied the billing rates of only the most senior partners of

___

[13] *See generally Report of the Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. at 243 (defining a multiplier as "[a]n increase or decrease of the lodestar amount").

26

plaintiffs' co-lead counsel, resulting in an artificially low multiplier. On this point, we agree. In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter.[14] That did not occur here. Had the hourly rates been properly blended, taking into account the approximate hourly billing rates of the partners and associates who worked on the case,[15] the multiplier would have been a higher figure,

---

[14]*Gunter* and *Cendant PRIDES* noted that a reasonable hourly billing rate takes account of the "nature of the services provided" and "the experience of the lawyer." *Gunter*, 223 F.3d at 195 n.1; *Cendant PRIDES*, 243 F.3d at 732 n.11. Both cases support the conclusion that the hourly fee of only the senior-most partners does not constitute a reasonable hourly billing rate.

[15]When applying the lodestar cross-check, certain district courts have applied a blended rate of partners and associates. *See, e.g., O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 310 (E.D. Pa. 2003) (using an approximate rate of $425 per hour in the lodestar cross-check, which took into account the different billing rates of the attorneys) and *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (taking into account different rates for partners and associates in the lodestar cross-check). *See also* The Manual for Complex Litigation (Fourth) § 21.724 (2004) ("a statement of the hourly rates for *all attorneys and paralegals* who worked on the litigation . . . . can

27

alerting the trial court to reconsider the propriety of its fee award. Failure to apply a blended rate, we believe, is inconsistent with the exercise of sound discretion and requires vacating and remanding for further consideration.

At the same time, we reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.[16] The district

---

serve as a 'cross-check' on the determination of the percentage of the common fund that should be awarded to counsel") (emphasis added).

[16]The 2002 Third Circuit Task Force On Selection of Class Counsel supports this view. It states that the lodestar cross-check is "not a full-blown lodestar inquiry" and a court "should be satisfied with a summary of the hours expended by all counsel at various stages with less detailed breakdown than would be required in a lodestar jurisdiction." *Report of the Third Circuit Task Force, Selection of Class Counsel*, 208 F.R.D. at 423. The cross-check would "enable the court to make a judgment as to whether the percentage appears too high or low given the time required to handle the case." *Id.* Even so, the Task Force cautioned courts to "be aware that lawyers have an incentive to increase their hours for cross-check purposes just as they have an incentive to maximize them when seeking lodestar compensation[.]" *Id.*

courts may rely on summaries submitted by the attorneys and need not review actual billing records. *See Prudential,* 148 F.3d at 342 (finding no abuse of discretion where district court "reli[ed] on time summaries, rather than detailed time records"). Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award.[17]  Lodestar multipliers are relevant to the abuse of discretion analysis.  But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.

## IV.

According to Kaufmann, class counsel's fee request created a conflict of interest with the class that violated the adequacy of representation protections of the Fifth Amendment's Due Process clause and Fed. R. Civ. P. 23.[18]  Kaufmann contends the District Court erred by failing to appoint

---

[17]Consideration of multipliers used in comparable cases may be appropriate. *See Gunter*, 223 F.3d at 195 n.1 ("courts should consider several factors in setting a fee award . . . . [including] awards in similar cases").

[18]Class counsel contend Kaufmann waived this argument by not raising it before the District Court.  But in his colloquy with the District Court during the May 30, 2003 hearing, Kaufmann stated "the Class should have an expert paid for by the Class fund."

an independent expert or class guardian to counter the expert declaration submitted by class counsel in support of their fee request. Kaufmann presented no expert of his own. Nonetheless, he contends that given the small stake individual class members have in the outcome, they cannot be expected to invest their own financial resources to retain an expert to advise the court on the excessiveness of the fee requests.

The determination of attorneys' fees in class action settlements is fraught with the potential for a conflict of interest between the class and class counsel. *See Cendant*, 264 F.3d at 254-55 (explaining that because clients seek to maximize recovery and lawyers seek to maximize fees, "there is often a conflict between the economic interests of clients and their lawyers, and this fact creates reason to fear that class counsel will be highly imperfect agents for the class"); *Cendant PRIDES*, 243 F.3d at 730 (discussing "the danger inherent in the relationship among the class, class counsel, and defendants" and recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements") (internal quotations omitted); Fed. R. Civ. P. 23(h), 2003 Advisory Committee Notes ("Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process.").

The appointment of a guardian, master, fee examiner, or independent expert can aid district courts in navigating the shoals of attorney fee determinations. *See Prudential*, 148 F.3d at 330 (noting that the district court appointed an independent

fee examiner to assist with its fee determination.). Nevertheless, whether to appoint an outside party to ensure the class receives adequate scrutiny of the fee determination is a matter properly committed to the sound discretion of the trial court.

At the fee determination stage, the district judge must protect the class's interest by acting as a fiduciary for the class. *See Cendant*, 264 F.3d at 231 ("[T]he District Court acts as a fiduciary guarding the rights of absent class members[.]"); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280-81 (7th Cir. 2002) ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."); *Report of the Third Circuit Task Force, Court Awarded Attorneys Fees*, 108 F.R.D. 237, 251 (1985) (The court "must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function."); *cf. Cendant*, 264 F.3d at 255 ("[A]n agent must be located to oversee the relationship between the class and its lawyers," and "[t]raditionally, that agent has been the court.").

Though some courts have noted potential problems with district judges serving in this role,[19] we entrust these matters to

[19]*See In re Cendant Corp. Litig.*, 182 F.R.D. 144, 150 (D.N.J. 1998) ("It is no insult to the judiciary to admit that a court's expertise is rarely at its most formidable in the evaluation of

31

the sound discretion of Article III trial judges to know when they can adequately protect the class's fiduciary interest or when they need an outsider to aid them in that role. *See Gunter*, 223 F.3d at 201 n.6 ("[A] district court that suspects that the plaintiffs' rights in a particular case are not being adequately vindicated *may* appoint counsel, a special master, or an expert to review or challenge the fee application[.]") (emphasis added); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994) (The district court has "the *discretion* to appoint counsel to represent Class Plaintiffs[.]") (emphasis added); Fed. R. Civ. P. 23(h)(4) ("The court *may* refer issues

_____

counsel fees[.]"); *In re Oracle Secs. Litig.*, 136 F.R.D. 639, 645 (N.D. Cal. 1991) ("Class counsel's fee application is presented to the court with the enthusiastic endorsement, or at least acquiescence, of the lawyers on both sides of the litigation, a situation virtually designed to conceal any problems with the settlement not in the interests of the lawyers to disclose."); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (Easterbrook, J., dissenting) ("[T]he court can't vindicate the class's rights because the friendly presentation means that it lacks essential information."); *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1998 WL 698354, at *1 (S.D.N.Y. Oct. 6, 1998) ("This role as fiduciary for the class members places the Court in the uncomfortable position of appearing to act as an adversary of plaintiffs' counsel for whom the Court has great respect and who undertook this case when there was no assurance that there would be any recovery.").

related to the amount of the award to a special master or to a magistrate judge[.]") (emphasis added).

There is no indication the able District Judge failed to act properly in his fiduciary capacity during the fee proceedings or that he abused his discretion in finding it unnecessary to appoint a guardian or expert to safeguard the class's interest in the fee award.

## V.

For the foregoing reasons, we will vacate the District Court's order awarding fees and costs, and remand for further proceedings consistent with this opinion.