**In re FLONASE ANTITRUST
LITIGATION.**

**Case No. 08–cv–3149.**

United States District Court,
E.D. Pennsylvania.

June 14, 2013.

Casandra A. Murphy, Kessler Topaz Meltzer & Check LLP, Radnor, PA, David S. Nalven, Edward Notargiacomo, Lauren Guth Barnes, Thomas M. Sobol, Kristen Johnson Parker, Hagens Berman Sobol Shapiro LLP, Cambridge, MA, Joseph H. Meltzer, Terence S. Ziegler, Kessler Topaz Meltzer & Check LLP, Radnor, PA, Michael M. Buchman, Pomerantz Haudek, New York, NY, Peter Barile, Linda P. Nussbaum, Grant & Eisenhofer, New York, NY, David P. Germaine, Joseph M. Vanek, Vanek Vickers & Masini PC, Chicago, IL, John D. Radice, Radice Law Firm, Long Beach, NJ, for Plaintiff.

Edward D. Rogers, Leslie E. John, Stephen J. Kastenberg, Arthur Makadon, Jason A. Leckerman, Jessica Moltisanti Anthony, Marcel S. Pratt, Ballard Spahr Andrews & Ingersoll LLP, Philadelphia, PA, Roger P. Thomasch, Ballard, Spahr, Andrews and Ingersoll, Denver, CO, for Defendant.

### MEMORANDUM

ANITA B. BRODY, District Judge.

Following nearly five years of antitrust class action litigation between the makers of branded Flonase nasal spray, the makers of a generic brand version, indirect purchasers of the drug, and direct purchasers, the parties reached a global settlement in January 2013. Before me now is the Direct Purchaser Plaintiffs' ("DPs") Corrected Motion for Approval of Settlement (Doc. 488) and Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs (Doc. 486). After holding a fairness hearing on June 3, 203 and reviewing the Plaintiffs' submissions, I now approve the final settlement agreement and allocation plan. I will also grant counsel's request for attorneys' fees, reimbursement of expenses, and incentive awards for class representative, although I will modify the incentive payment awarded.

## I. BACKGROUND

Named plaintiffs American Sales Company, Inc., Meijer, Inc., and Meijer Distribution, Inc. brought this suit on behalf of a class of 33 companies that purchase medications directly from the manufacturer—in this case, purchasers of Flonase, the brand-name version of fluticasone propionate ("FP"), a nasal corticosteroid used to treat nasal inflammation caused by allergies. The suit claimed that Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline PLC ("GSK") improperly delayed the entry of generic FP, resulting in overcharges to the direct purchasers. Plaintiffs allege that this allowed GSK to unlawfully maintain monopoly power in the American FP market; maintain the price of Flonase at above-competitive levels; and overcharge the direct purchasers millions of dollars by blocking unrestricted competition and access to less expensive generic versions of FP.

This case has an extensive litigation history. American Sales filed the first complaint against GSK for its anticompetitive behavior in 2008.[1] Extensive discovery began in late 2008 and continued through mid–2010, including 30 depositions of current and former employees of GSK and Roxane Laboratories ("Roxane"), the maker of generic FP. Over a dozen expert reports and rebuttals were submitted. After oral argument, I certified a class of 33

---

1. Related cases were also filed by indirect purchasers of the drug (No. 08–3301) and Roxane Laboratories ("Roxane") (No. 09– 1638), the maker of a generic competitor to Flonase.

direct purchasers of Flonase on November 12, 2010. *See American Sales Company, Inc. v. SmithKline Beecham Corp.*, 274 F.R.D. 127 (E.D.Pa.2010).[2] In 2011, I denied two separate GSK motions for summary judgment, one on causation, and one on *Noerr–Pennington* immunity. *See* 798 F.Supp.2d 619 (E.D.Pa.2011) and 795 F.Supp.2d 300 (E.D.Pa.2011), respectively. The case was set for trial in early 2013, and both sides submitted over a dozen motions *in limine.* With the court's assistance, the parties reached a settlement agreement in November 2012, whereby GSK agreed to pay $150 million in exchange for the settlement of all direct purchaser claims. I preliminarily approved the settlement on January 14, 2013.

## II. FINAL APPROVAL OF SETTLEMENT

According to Federal Rule of Civil Procedure 23(e), "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In other words, "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'" *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 316 (3d Cir. 1998) (quoting *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995)).

The Third Circuit applies a nine prong test, known as the *Girsh* factors, when determining the fairness, adequacy, and reasonableness of a proposed class action settlement:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3)

the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (internal quotation marks and ellipses omitted). In more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as *Prudential* considerations, such as:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for *335 individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

---

**2.** After notice went out, there was not a single objector or exclusion from the class certification.

*In re Prudential,* 148 F.3d at 323; *see also In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 350 (3d Cir.2010). District courts "must make findings as to each of the Girsh factors, and the *Prudential* factors where appropriate," and "cannot substitute the parties' assurances or conclusory statements for [their] independent analysis of the settlement terms." *In re Pet Food.,* 629 F.3d at 350–51.

■ Here, the Girsh factors and relevant Prudential considerations weigh in favor of settlement approval.

## A. The Complexity, Expense, and Likely Duration of the Litigation

This suit involves highly complex antitrust issues, FDA bioequivalence standards for suspension nasal spray products, pharmaceutical manufacturing and supply issues, and pharmaceutical regulatory issues, all of which were investigated and litigated for more than four years. Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig.,* 2008 WL 63269, at *4–5, 2008 U.S. Dist. LEXIS 569, at *14 (E.D.Pa. Jan. 3, 2009) ("This litigation, like most antitrust cases, has been exceedingly complex, expensive, and lengthy.") (emphasis added). " 'An antitrust class action is arguably the most complex action to prosecute....' " *In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (quoting *In re Motorsports Merchandise Antitrust Litig.,* 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000)). The DPs and GSK reached this settlement after they had completed significant preparation for trial, including litigating *Daubert* challenges, identifying hundreds of trial exhibits, and briefing over a dozen motions *in limine* between them. The settlement avoided the need for a difficult and expensive multi-week trial involving complex scientific

and regulatory testimony, and the time and expense associated with the appeal that would likely have followed a verdict. This factor strongly supports settlement.

## B. The Reaction of the Class to the Settlement

All 33 class members received direct notice, via first-class mail, of the class settlement. There has not been a single objection. Moreover, two of the three largest pharmaceutical distributors in the country—class members whose claims collectively represent the majority of the total recovery—have submitted letters affirmatively supporting the settlement. This factor overwhelmingly supports settlement approval.

## C. The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings advanced to a sufficiently late stage prior to settlement that the related *Girsh* and *Prudential* factors also weigh in favor of approval. Explaining the rationale behind the third *Girsh* factor, the Third Circuit wrote in *Prudential:*

> The parties must have an "adequate appreciation of the merits of the case before negotiating." To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

*In re Prudential,* 148 F.3d at 319 (quoting *In re G.M.,* 55 F.3d at 813). Further, "courts generally recognize that a proposed class action settlement is presumptively valid where ... the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 144–45 (E.D.Pa. 2000).

This factor also weighs strongly in favor of approval of the settlement agreement. This case was very advanced by the time the agreement was reached. Fact discovery concluded in February 2010 and included 45 depositions and millions of pages of documents. Expert discovery concluded in September 2010 and included the exchange of numerous expert reports. The parties briefed two separate motions for summary judgment. The Court heard *Daubert* motions concerning experts on both sides on two separate occasions. By the time the agreement was reached, the parties had exchanged trial witness lists, conferred on trial exhibits and deposition testimony to be used at trial, and submitted pretrial memoranda. Trial was just two months away when the parties reached their agreement.

### D. The Risks of Establishing Liability and Damages.

These two *Girsh* factors are closely related, so I will address them together. This case involved complex scientific, regulatory, and legal issues, and plaintiffs faced many obstacles to success at trial. Among other things the Plaintiff would have to prove were two particularly difficult propositions: First, they would have had to prove that GSK's petitions to the FDA regarding generic FP were objectively baseless and that GSK could not have reasonably expected success on the merits of any of its requests to the FDA. Second, and most crucially, Plaintiffs would have had to prove that GKS's petitions to the FDA were a substantial cause of any delay in the approval of Roxane's generic FP, and that, but for GSK's actions, Roxane would have had the manufacturing capability to get its product to market sooner. These difficulties go both to Plaintiffs' case for liability and their case for damages, as they would have had to show that GSK's actions resulted in improper overcharges

to the DPs. Given the complexity of these issues, there is no guarantee that a jury would have found GSK liable, or how the jury would have responded to the complicated economic data necessary to show damages. Therefore, these two factors counsel in favor of settlement.

### E. The Risks of Maintaining the Class Action Through Trial

■ Although I already certified the DP class here, class certification is subject to review and modification at any time during the litigation. *See Zenith Lab., Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1976). However, numerous courts, including the Third Circuit, have certified nearly identical classes of direct purchasers bringing antitrust claims against manufacturers allegedly seeking to delay generic competition in the pharmaceutical industry. *See, e.g., In re K–Dur Antitrust Litig.,* 686 F.3d 197 (3d Cir.2012); *In re Wellbutrin SR Direct Purchaser Antitrust Litig,* C.A. No. 05–5525, 2008 WL 1946848 (E.D.Pa. May 2, 2008); *Teva Pharms. USA, Inc. v. Abbott Labs.,* 252 F.R.D. 213 (D.Del.2008). Because Plaintiffs do not face much risk in maintaining a certified class throughout trial, this factor is neutral.

### F. The Ability of the Defendants to Withstand a Greater Judgment

■ This factor is also neutral. The ability of defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp.,* 761 F.Supp.2d 241, 254 (E.D.Pa.2011). That does not appear to be the case. I have not been presented with any evidence indicating that GSK is at risk of insolvency. Regardless, I follow

my district court colleagues within the Third Circuit who "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *15, 2011 U.S. Dist. LEXIS 38663, at *42 (D.N.J. Apr. 8, 2011) (citing *McCoy v. Health Net. Inc.*, 569 F.Supp.2d 448, 462, (D.N.J.2008); *Weber v. Gov't Emples. Ins. Co.*, 262 F.R.D. 431, 446 (D.N.J.2009)). Therefore, this Girsh factor neither supports nor undercuts the parties' settlement.

### G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

Taken together, the final two *Girsh* factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir.2004). These factors confirm that the settlement here should be approved. A proposed settlement totaling $150 million cash is reasonable both in absolute terms and in light of the circumstances of this litigation, particularly the risks of establishing liability at trial. Under the settlement, each class member can benefit from the $150 million fund immediately, and avoid the uncertainties and delay inherent in continuing to litigate this complex class action.

In *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, the Third Circuit warned "against demanding too large a settlement … after all, settlement is a compromise, yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d 768, 806 (3d Cir.1995). With that warning in mind, I agree with class counsel and find that the $150,000,000 figure is reasonable. Therefore, this factor weighs in favor of settlement.

### H. *Prudential* Factors

In *Prudential*, the Third Circuit noted that, "since *Girsh* was decided in 1975, there has been a sea-change in the nature of class actions," noting that it therefore "may be useful to expand the traditional *Girsh* factors" to add additional topics for the district courts to take into consideration when reviewing a proposed settlement agreement. *In re: Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283 (3d Cir.1998). Here, the relevant *Prudential* factors counsel in favor of approving the settlement. First, as has been explained above, the case was settled only after extensive discovery and trial preparation. The underlying substantive issues were therefore well-developed, supporting approval of the settlement. Second, as to the results achieved for the individual class members compared to those achieved for other claimants, there are no direct purchaser class members who have filed a separate lawsuit against GSK. Therefore, the settlement creates the only award for class members. Third, class members were given the chance to opt out when I originally certified the class in 2010. No class member requested exclusion. While I declined to allow class members an additional opportunity to opt out of the class after receiving notice of the settlement, not a single class member objected to the settlement for any reason, including on the basis that no opt-out right was given. Therefore, the absence of a second opt-out right was of no consequence here. As to attorneys' fees, as I will discuss in the next section, the provisions for attorneys' fees are reasonable. Sixth, the procedure for processing individual claims under the settlement is fair and reasonable. Class

members will be provided with information reflecting their qualifying purchases, as reflected in GSK's sales records, and will be advised of their proposed *pro rata* share of the total purchases. They will have the opportunity to review the information based on their own data. Once all claims have been submitted, payments will be distributed based on each class member's pro rata share of the purchases, so that if one direct purchaser made 10 percent of the purchases, it will receive 10 percent of the settlement fund.

The *Girsh* factors and the *Prudential* factors all counsel strongly in favor of approval of the class settlement. I therefore find the settlement to be fair, reasonable, and adequate.

## III. ATTORNEYS' FEES AND EXPENSES

■ Class counsel seeks (i) an award of attorneys' fees in the amount of $50 million, or one-third of the $150 million settlement fund (plus interest); (ii) reimbursement for litigation costs and expenses totaling $2,069,433; and (iii) approval of an incentive award to class representatives American Sales and Meijer in the amount of $85,000 and $75,000, respectively. Doc. No. 486.

Federal Rule of Civil Procedure 23(h) states: "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." The proposed settlement agreement states class counsel's intention to seek attorneys' fees of up to 33 1/3 percent of the total settlement fund, along with reimbursement of reasonable costs and expenses incurred, all of which will be paid directly from the settlement fund. Settlement Agreement ¶ 9, Mot. for Preliminary Approval of Settlement Ex. A, Doc. No. 480–2. Nonetheless, "a thorough judicial review of fee

applications is required in all class action settlements." *In re Prudential*, 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819).

■ Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method. *In re Prudential*, 148 F.3d at 333. The former is "more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* The latter method, on the other hand, is "generally favored in cases involving a common fund...." *Id.* Either way, "it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir.2005).

### A. Applying the *Gunter* Factors

The settlement agreement at issue here establishes a common fund of $150 million, from which the class members will receive their allocations and the attorneys will receive any award and expense reimbursement. "[I]n the traditional common fund situation ... the district court ... should attempt to establish a percentage fee arrangement agreeable to the Bench and plaintiff's counsel." *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985). In order to make that determination, the Third Circuit has identified ten factors for the Bench to consider. These include:

(1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of

nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir.2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000); *In re Prudential*, 148 F.3d at 336–40). These *Gunter/Prudential* factors are not exhaustive, and a district court should consider " 'any other factors that are useful and relevant with respect to the particular facts of the case.' " *In re Diet Drugs*, 582 F.3d at 541 n. 34 (quoting *In re AT & T Corp. Sec. Litig.*, 455 F.3d 160, 166 (3d Cir.2006)).

### 1. The size of the fund created and the number of beneficiaries

The settlement creates a $150 million settlement fund. Each of the 33 direct purchaser class members will receive a *pro rata* share based on their purchases of Flonase from the net fund, after attorneys' fees, expenses, and incentive awards, plus accrued interest, are removed. This is a sizeable settlement, and provides immediate and certain payment to the class members. Every dollar of the net fund will be distributed to class members. This factor counsels in favor of approval of the requested fee.

### 2. The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel

As discussed above, there are no objections by any class members to this settlement. This factor strongly supports approval of the requested fee.

### 3. The skill and efficiency of the attorneys involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." *Id.* at 198. The *Cullen* court explained that "[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 149 (E.D.Pa.2000).

Thomas Sobol of Hagens Berman Sobol Shapiro LLC and Joseph Meltzer of Kessler Topaz Meltzer & Check, LLP were co-lead counsel for the direct purchasers in this case. Both firms have extensive experience in plaintiff-side class action, with particular expertise in delayed generic entry cases. Indeed, counsel for both sides were knowledgeable, tenacious, and highly skillful. As discussed above, the $150 million settlement award represents a substantial amount and clearly demonstrates the value of class counsel's efforts. This factor supports approval of the requested fee.

### 4. The complexity and duration of the litigation

I have already addressed this matter above in my discussion of the *Girsh* factors. This factor weighs strongly in favor of the proposed fee.

### 5. The risk of nonpayment

The risk of nonpayment here was not negligible. As explained above in analyzing the risks of establishing liability under the *Girsh* analysis, success in this litigation

was by no means guaranteed. *See In re Rite Aid*, 396 F.3d at 304 (finding the "risks of establishing liability" analysis relevant to the assessment of the risk of non-recovery). Even if Plaintiffs had succeeded in proving liability at trial, there is no guarantee they would have recovered damages. *See, e.g., U.S. Football League v. National Football League*, 644 F.Supp. 1040, 1042 (S.D.N.Y.1986) (noting the jury's award of only $1 in nominal damages to the plaintiffs). Moreover, as a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. This factor supports approval of the requested fee.

### 6. The amount of time devoted to the case by plaintiffs' counsel

According to their declaration, class counsel spent more than 40,000 hours over the course of more than four years litigating this case. More than 35,000 hours were logged by the two lead counsel firms alone. The record of this litigation also indicates that the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case, considering both the complexity of the issues and the robust defense mounted by the defendants. This factor weighs in favor of the requested fee.

### 7. The awards in similar cases

The fee request here is consistent with other direct purchaser class actions involving allegations of overcharges arising from suppressed generic drug competition. Just last year, for example, this court approved a one-third attorneys' fee from one such case with a $37.5 million settlement fund. Final Order and Judgment Approving Settlement at 8, *In re Wellbutrin XL*

*Antitrust Litigation*, No. 08–2431 (E.D.Pa. Nov. 7, 2012). Indeed, in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees. *In re Wellbutrin, id.; Rochester Drug Co–Operative, Inc. v. Braintree Labs., Inc.*, No. 07–142–SLR (D.Del. May 31, 2012) (awarding fees of one-third of $17.5 million settlement fund); *In re Metoprolol Succinate Antiturst Litig.*, No. 06–52–MPT (D.Del. January 12, 2012); *In re DDA VP Direct Purchaser Antitrust Litig.*, No. 05–2237 (S.D.N.Y. Nov. 28, 2011); *In re Wellbutrin SR Antitrust Litig.*, No. 04–5525 (E.D.Pa. November 21, 2011); *Meijer, Inc. v. Abbott Labs.*, No. 07–05985–CW (N.D.Cal. Aug. 11, 2011); *In re Nifedipine Antitrust Litig.*, No. 03–mc–223–RJL (D.D.C. Jan. 31, 2011); *In re Oxycontin Antitrust Litig.*, No. 04–md–1603–SHS (S.D.N.Y. Jan. 25, 2011).

It is also important to emphasize that every single class member received direct notice of the settlement agreement, including counsel's intention to request a one-third fee, and not a single class member objected. What is more, two of the three largest pharmaceutical distributors in the country, whose claims collectively represent more than half of the total recovery, have expressly indicated their support of the settlement.[3] This factor supports approving the requested fee.

### 8. The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations

Class counsel was not assisted by a government investigation. In *Prudential*, the

---

3. *See* Corrected Decl. of Co–Lead Counsel Thomas M. Sobol and Joseph H. Meltzer in Support of Direct Purchaser Plaintiffs' Unopposed Motion for Final Approval of Settlement Ex. B. ("CardinalHealth is satisfied that

... the proposed attorneys' fee award of one-third of the settlement amount is appropriate in this case"); Ex. C ("McKesson ... supports class counsel's application for attorneys' fees and reimbursement of costs").

Third Circuit singled this factor out for important consideration by district courts. *See In re Prudential,* 148 F.3d at 338. The appeals court remanded the trial court's fee award for wrongly "credit[ing] class counsel with creating the entire value of the settlement" and overlooking the considerable contributions of a multi-state life insurance task force. *Id.* Yet this case is more similar to *In re AT & T,* in which the Third Circuit found that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel." *In re AT & T,* 455 F.3d at 173. Although other plaintiffs pursued claims against GSK, counsel for the direct purchaser plaintiffs launched the first action and led joint litigation efforts, taking the lead in discovery and development of scientific and FDA experts, significant motion practice, and trial preparation. This factor weighs in favor of the proposed fee.

9. **The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained**

It is extremely difficult to determine what fee would have been negotiated at the outset of the litigation. I can only look to my colleagues who have attempted to apply this factor, even though I recognize that the contingent fee can only be "based on the particular facts and circumstances of the specific litigation under consideration." *In re United States Bioscience Sec. Litig.,* 155 F.R.D. 116, 119 (E.D.Pa. 1994). After appointing a Special Master to study the award of attorneys' fees in a class action securities suit, Judge Dalzell approved of the Special Master's recommendation that a thirty percent fee award was an appropriate estimate of what would have been negotiated. *See id.* (citing Re-

port and Recommendation of Special Master Judge Arlin M. Adams). Judge Katz noted that in private contingency fee cases, "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." *In re Ikon,* 194 F.R.D. at 194. Of course, Judge Katz was referring to tort matters in particular. In the end, I do "not give great weight to this hypothetical exercise." *In re Prudential,* 148 F.3d at 340. This factor is neutral and will not be considered to count for or against the proposed fee request.

10. **Any innovative terms of settlement.**

The terms of this settlement are relatively standard. In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

11. **Summation**

I recognize that the *Gunter/Prudential* factors " 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.' " *In re AT & T,* 455 F.3d at 166 (citing *In re Rite Aid.,* 396 F.3d at 301). In sum, after " 'engag[ing] in a robust assessment [ ] of the fee award reasonableness factors,' " I have determined that eight of the ten *Gunter/Prudential* factors count in favor, while the remaining two are neutral. *Id.* (citing *In re Rite Aid,* 396 F.3d at 302). Therefore, there is overwhelming support for the proposed fee. The lodestar cross-check, moreover, militates in favor of approval.

**B. Lodestar**

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reason-

able hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid,* 396 F.3d at 305. Once the lodestar is calculated, "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases." Manual for Complex Litigation (Fourth) § 14.122 (2004).

### 1. Number of Hours and Hourly Rates

Class counsel reports that they cumulatively spent more than 41,000 hours litigating this case over the last nearly five years. Seven different firms worked on the Plaintiffs' case, though the vast majority of hours were logged by the two lead counsel firms, Hagens Berman Sobol Shapiro LLC and Kessler Topaz Meltzer & Check LLP. At my request, class counsel submitted copies of their time and expense records for in camera review. The nearly five years of work included, among other work, preparing the complaint; conducting extensive discovery including taking 39 depositions of current and former employees of GSK and Roxane; filing for class certification; submitting 13 opening and rebuttal expert reports; opening and defending *Daubert* challenges; defending two separate motions for summary judgment; and preparing for trial, including filing eight motions *in limine* and defending against eight motions *in limine.* The law firms charged different amounts based on their average billable rates and the individual attorney or staff member working on the assignment, with hourly rates ranging from $120 to $795.

Taking the reported hours at the attorneys' current rate reveals a lodestar of $18,616,424. Counsel explained in their briefing that, after reviewing the reported hours, they revised the lodestar downward to delete unnecessary duplication of effort, misreported time, and other errors, and came up with a lodestar that "exceeds $16,750,000." Under the revised figure, the average billable rate is $407 per hour.

### 2. Lodestar Multiplier

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." *In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 539 (3d Cir.2009) (citing *In re Rite Aid,* 396 F.3d at 305–06). The Third Circuit explained that "multipliers may reflect the risks of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for extraordinary result. By nature they are discretionary and not susceptible to objective calculation." *In re Prudential,* 148 F.3d at 340. The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($50,000,000.00) by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates ($16,750,000). Here, that calculation comes to a multiplier of 2.99, meaning class counsel would receive nearly three times their regular billing rates. The Third Circuit has recognized that " 'multiples ranging from one to four are frequently· awarded in common fund cases when the lodestar method is applied.' " *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 150 (2000) (Brody, J.) (internal quotation omitted). *See also In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 742 (3d Cir.2001) (citing *In re Prudential,* 148 F.3d at 341). Indeed, courts in this circuit have accepted multipliers much higher than the one here. *See, e.g., Meijer, Inc. v. 3M,* No. 04–5871, 2006 WL 2382718 at *24 (E.D.Pa. Aug. 14, 2006) (approving a percentage fee award that translated to a 4.77

multiplier); Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal As to All Defendants, *In re Tricor Direct Purchaser Antit. Litig.*, No. 05–340 at 9 (D.Del. Apr. 23, 2009) (approving a one-third fee where lodestar multiplier was 3.93).

Therefore, a multiple of 2.99 is within the generally acceptable range and provides additional support for approving the attorneys' fees request. Thus I will award counsel thirty-three and a third percent of the common fund, for a total of $50,000,000.00, in attorneys' fees.

## C. Costs

Class counsel requests reimbursement of $2,069,433 for expenses incurred litigating the case. Two-thirds of this amount reflects fees paid experts, including to pharmaceutical science experts, FDA regulatory specialists, and economic experts, all of whom were integral to the Plaintiffs' prosecution of the case. The next largest category of expenses, what class counsel calls "document management," represents less than ten percent of the total costs. As class counsel notes, they had a strong incentive to conserve their expenses, given that they were incurred with no guarantee of recovery. I find that these expenses were reasonable and proper. Therefore, I will award counsel a reimbursement of these expenses from the settlement fund.

## IV. Incentive Awards for Class Representatives

■ Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997). As a matter of practice, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Id.* (citing numerous cases in which incentive awards were granted). I agree with my colleagues who have held that "[r]easonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation." *First State Orthopaedics v. Concentra. Inc.*, 534 F.Supp.2d 500, 524–25 (E.D.Pa.2007) (referencing *Nichols v. SmithKline Beecham Corp.*, No. 00–6222, 2005 WL 950616, at *24 (E.D.Pa. April 22, 2005); *Godshall v. Franklin Mint Co.*, No. 01–6539, 2004 WL 2745890 (E.D.Pa. Dec. 1, 2004,)).

■ Plaintiffs seek an incentive award for the two class representatives, American Sales and Meijer, in the amount of $85,000 and $75,000, respectively. Though incentive awards are appropriate in this case, the requested amounts are too large. I will award American Sales $50,000 and Meijer $40,000.

These class representatives launched this litigation despite the risk of retaliation inherent in suing a supplier. This risk should be recognized. The class representatives "actively assisted in the preparation and prosecution of the case by collecting and producing records, preparing for and giving depositions and agreeing to participate in what could have been a several-week trial, turning attention away from their daily business." Pls.' Mot. for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs, Sobol and Meltzer Decl., at ¶ 16. The $10,000 difference in the requested award reflects the fact that American Sales filed the first complaint, and maintained the

action for nearly a year before Meijer filed its own action.

Finally, an incentive award of $50,000 and $40,000 is within the range of payments awarded by courts within the Third Circuit in other direct purchaser antitrust litigation. *See, e.g., Tricor*, No. 05–340 at 11 (D.Del. Apr. 23, 2009) (awarding $50,000 to each of three class representatives); *Bradburn Parent Teacher Store v. 3M (Minnesota Mining and Manufacturing Company)*, 513 F.Supp.2d 322, 342 (E.D.Pa.2007) (awarding $75,000 to one class representative); *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 480 (awarding $60,000 to each class representative).

## V. Plan of Distribution and Proposed Claim Form

■■■ When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. Therefore, the proposed plan needs to be fair, reasonable and adequate. *In re Cendant Corp. Litig.*, 264 F.3d 201, 248 (3d Cir.2001). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D.Pa.2000). The plan of distribution, which was submitted with the Plaintiffs' memorandum in support of its motion for preliminary approval of the settlement (Doc. No. 480–1, at Ex. B), meets this standard. Under the plan proposed by Plaintiffs, as revised in their current motion, the claims administrator will mail claim forms to every class member within five days of final approval of the settlement. This form will include calculations made by the settlement administrator of each class member's qualifying Flonase purchases during the class period, based on GKS's sales data. Class members have thirty-five days after final ap-

proval to submit their executed claim forms, in which they either accept the administrator's calculations or provide their own Flonase purchase data to support a revised purchase amount. By sixty-five days after final approval, class counsel will submit to the court a motion for distribution of the net settlement fund supported by a declaration of the settlement administrator. Under this plan, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying Flonase purchases.

I find that the proposed plan is fair, reasonable, and adequate, especially as claimants are expected to receive the maximum amount they would have received if they had opted for trial and won. I also find that the proposed claim form is clear, fair, and reasonable.

## VI. Conclusion

For the reasons explained above, I will grant Plaintiff's Motion for Final Approval of Settlement and their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs.

### FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT

The Court, having considered (a) plaintiffs' motion and memorandum in support of the motion for preliminary approval of Settlement and accompanying exhibits (Dkt. Nos. 480, 481, Ex. AL); (b) plaintiffs' motion and memorandum in support of motion for an award of attorney fees and expenses (Dkt. Nos. 486 and 486–1); (c) the declaration by co-lead counsel Thomas M. Sobol and Joseph H. Meltzer in support of the direct purchaser plaintiffs' motion for an award of attorneys' fees and expenses (Dkt. No. 486–2); (d) direct purchaser plaintiffs' motion and memorandum of law in support of unopposed motion for

final approval of Settlement; (e) the declaration of co-lead counsel Thomas M. Sobol and Joseph H. Meltzer in support of direct purchaser plaintiffs' unopposed motion for final approval of Settlement; and (f) the concluded fairness hearing and all other prior proceedings herein, pursuant to Rules 23 and 54(b) of the Federal Rules of Civil Procedure, and in accordance with the terms of the Settlement Agreement between plaintiffs American Sales, LLC f/k/a American Sales, Inc. ("American Sales"), and Meijer, Inc. and Meijer Distribution, Inc. ("Meijer") (collectively, "plaintiffs"), individually and on behalf of the certified direct purchaser class in the above-captioned actions In re Flonase Antitrust Litigation, Case No. 08–3149 (E.D.Pa.) (the "Actions"), and defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK" or "Defendant") dated November 15, 2012 (the "Settlement Agreement"),

**IT IS HEREBY ORDERED** as follows:

1. This final order and judgment incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings set forth in the Settlement Agreement. As set forth in the Court's November 10, 2010 Order (Dkt. No. 161), as modified by the Court's February 9, 2011 Order (Dkt. No. 215), and as reflected in the notice approved by the Court to be sent to the Class by Order dated April 25, 2011, and which notice was duly disseminated pursuant to Court Order (the "Class certification order"), the "Class" is defined as follows:

> All persons or entities in the United States and its territories who purchased Flonase nasal spray directly from Defendant (or any of its predecessors or affiliates) at any time from May 19, 2004 until March 6, 2006, excluding defendant, its predecessors, directors, management, employees, subsidiaries, parent or affiliates, and government entities or persons.

## A. Notice to the Class.

2. Pursuant to the Court's Class certification order, Court-approved notice was disseminated by First–Class mail to all members of the Class and publication of the notice was made in the industry publication known as *The Pink Sheet* and in *The Pink Sheet* electronic newsletter. No Class member requested exclusion from the Class. The Class as certified on November 10, 2010, as modified on February 9, 2011, is hereinafter referred to as the "Class." The Class includes, among other entities, the named plaintiffs American Sales, LLC; and Meijer, Inc. and Meijer Distribution, Inc. by virtue of an assignment of rights from Class member Frank W. Kerr, Co. dated October 4, 2002.

3. This Court has jurisdiction over this action and over each of the parties and over all members of the Class. As set forth in more detail in the Settlement Agreement, defendant GSK has agreed to pay, and has timely paid, a total of $150 million to settle this action.

4. As required by this Court in the preliminary approval order, on February 14, 2013, notice of the proposed Settlement was mailed by First–Class mail to all members of the Class to the last known address of each entity within the definition of the Class. Also as required by the preliminary approval order, on February 18, 2013 the publication notice appeared in the industry publication *The Pink Sheet.* On February 18, 2013 and March 4, 2013 notice of the Settlement appeared in *The Pink Sheet* electronic newsletter. The notice was also posted, along with relevant litigation and Settlement documents, on the settlement website www.FlonaseDirect Settlement.com, created specifically for the

purpose of advising Class members of the fact and terms of the Settlement.

5. Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Fed.R.Civ.P. 23(e) and due process of law and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

6. Due and adequate notice of the proceedings having been given to the Class of their right to object to the Settlement, the plan of allocation, and class counsel's application for incentive payments for named plaintiffs and attorneys' fees and reimbursement of expenses associated with the actions, and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class members are bound by this final order and judgment.

### B. Approval of the Settlement.

7. The parties' Settlement resulted from an extensive investigation of facts, complete discovery, expert analysis and reports, motion practice, and development of the case for trial. The Settlement of this direct purchaser class action was not the product of collusion between the representative plaintiffs American Sales and Meijer, the direct purchaser class, and GSK or their respective counsel, but rather was the result of *bona fide* and arm's-length negotiations conducted in good faith between class counsel and GSK's counsel.

8. The Court has held a hearing to consider the fairness, reasonableness and adequacy of the proposed Settlement, and has been advised that there have been no objections to the Settlement from any members of the Class, and also that Class members Cardinal Health, Inc. and McKesson Corp. have explicitly stated their support for the Settlement and class

counsel's requested attorneys' fees and expense reimbursement, and the requested incentive awards to the representative plaintiffs American Sales and Meijer.

9. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement and finds that the Settlement is, in all respects, fair, reasonable and adequate to Class members. Accordingly, the Settlement shall be consummated in accordance with the terms and provisions of the Settlement Agreement. The Settlement is fair, reasonable and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975), as detailed in the accompanying memorandum.

### C. Approval of the plan of distribution.

10. The Court approves the plan of distribution (the "plan") of the Settlement proceeds (net of attorneys' fees, reimbursed expenses and incentive awards) proposed by plaintiffs. The plan proposes to distribute the net Settlement proceeds *pro rata* based on Class members' purchases of Flonase during the Class period, and does so fairly and efficiently. It directs Rust Consulting, Inc., the claims administration firm retained by class counsel and approved by the Court in the preliminary approval order, to distribute the net Settlement proceeds to Class members in the manner provided in the plan.

11. Class members shall look solely to the net Settlement proceeds for settlement and satisfaction against Defendant of all claims that are released by this Order, and shall not under any circumstances be entitled to any further compensation from Defendant with respect to any claims released by this Order. Except as provided by this Order, no Class member shall have

any interest in the Settlement proceeds or any portion thereof.

### D. Approval of the proposed claim form.

12. The Court approves the proposed claim form to be used by Rust to notify each Class member of Rust's estimate of the Class member's purchases of Flonase during the class period, based on data produced by GSK in the litigation and provided to Rust by class counsel, as well as Rust's estimate of the Class member's *pro rata* share of the net settlement fund.

### E. Dismissal of claims.

13. All claims in the above-captioned Actions against GSK are hereby dismissed with prejudice and in their entirety, on the merits, and without costs.

14. As used throughout this Order, and specifically in this section E, references to the "Class," "members of the Class," or "Class members" refer to members of the Class and include any of their past, present or future officers, directors, stockholders, attorneys, employees, legal representatives, trustees, agents, parents, subsidiaries, general and limited partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such.

15. In accordance with the Settlement Agreement, upon the Settlement Agreement becoming final and effective in accordance with its terms:

a. Defendant and its past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees, agents, attorneys, and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors, purchasers, and assigns of each of the foregoing) (the "Released Party" or "Released Parties") are and shall be re-leased and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, and liabilities of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages or liabilities arise or are incurred before, during or after the date of the Settlement Agreement), including costs, expenses, penalties and attorneys' fees known or unknown, suspected or unsuspected, in law or equity, that plaintiffs or any member or members of the Class, whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, indirectly, representatively, derivatively or in any other capacity, relating to any conduct, events or transactions, prior to the date hereof, alleged or which could have been alleged in the Actions, relating to fluticasone propionate nasal sprays (branded Flonase and/or its generic equivalents) (the "Released Claims"). Except for enforcing the Settlement Agreement, each member of the Class shall not, hereafter, seek to establish liability against any Released Party based, in whole or in part, on any of the Released Claims. Without in any way limiting the definition of Released Parties, the following specific entities are released parties: SmithKline Beecham Corporation d/b/a GlaxoSmithKline; GlaxoSmithKline LLC; GlaxoSmithKline Holdings (America) Inc.; GlaxoSmithKline plc; Smith Kline Beecham plc; GlaxoWellcome plc.; GlaxoSmithKline Finance plc.; GlaxoSmithKline Services Unlimited; and Smith Kline Beecham Limited.

b. In addition, plaintiffs and each Class member hereby expressly waives and releases, upon the Settlement becoming final and effective pursuant to the provisions of the Settlement Agreement, any and all

provisions, rights and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. *General Release—Claims Extinguished.* A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or rights and benefits conferred by any law of any state or territory of the United States or any other jurisdiction or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. Plaintiffs and each Class member may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of this paragraph, but each plaintiff and each Class member hereby expressly waives and fully, finally and forever settles and releases, upon the Settlement Agreement becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim that would otherwise fall within the definition of Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs and each Class member also hereby expressly waives and fully, finally and forever settles and releases any and all claims it may have against any Released Party under § 17200, et seq., of the California Business and Professions Code, or any similar, comparable or equivalent provision of the law of any other state or territory of the United States or other jurisdiction or principle of common law, which claims are hereby expressly incorporated into the definition of Released Claims.

c. Plaintiffs, their counsel, and the Claims Administrator will ensure that each claim form contains a copy of the releases set forth in paragraph 10(a) through (c) of the Settlement Agreement, which shall be signed by each member of the Class or its authorized representative as a precondition to receiving any portion of the settlement fund. The releases set forth above shall be binding and effective as to all Class members and each Class member shall be permanently barred and enjoined from asserting any Released Claims as defined herein.

d. The releases set forth above shall not release any claims arising in the ordinary course of business between plaintiffs, Class members and the Released Parties concerning product liability, breach of warranty or contract (other than breach of warranty or contract based in whole or in part on any conduct challenged in the Actions), personal or bodily injury.

## F. Award of attorneys' fees.

16. Class counsel have moved for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rules 23(h)(3) and 54(d) of the Federal Rules of Civil Procedure, and pursuant to the factors for assessing the reasonableness of a class action fee request as set forth in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000), and *In re Prudential Ins. Co. of America Sales Practice Litig.*, 148 F.3d 283, 340 (3d Cir. 1998), this Court awards a fee of 33 1/3 percent of the settlement fund, in the amount of $50,000,000, plus interest accrued thereon, if any. The Court finds this award to be fair and reasonable, as explained in the accompanying memorandum.

17. Further, class counsel are hereby awarded $2,069,433 from the settlement fund to reimburse them for the expenses

they incurred in the prosecution of this lawsuit, which expenses the Court finds to be fair, and reasonably incurred to achieve the benefits to the Class obtained in the settlement to the Class. The awarded fees and expenses shall be paid to class counsel from the settlement fund in accordance with the terms of the Settlement Agreement. Co-lead counsel shall allocate the fees and expenses among class counsel.

18. Any and all disputes arising out of or related to the Settlement or the Settlement Agreement must be brought by Defendant, plaintiffs and each member of the Class exclusively in this Court. Without affecting the finality of this judgment, the Court retains exclusive jurisdiction over the Settlement and Settlement Agreement, including the administration of the Settlement Agreement, the plan of distribution, and in order to determine any issues relating to attorneys' fees and expenses and any distribution to members of the Class. In addition, without affecting the finality of this judgment, GSK and each member of the Class hereby irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to the Settlement or Settlement Agreement or the applicability or interpretation of the Settlement Agreement, including, without limitation any suit, action, proceeding or dispute relating to the release provisions therein, except that this submission to the Court's jurisdiction shall not prohibit (a) any Released Party from asserting in the forum in which a claim is brought that the release included in the Settlement Agreement is a defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in that forum, and this Court determines that it cannot bar the claim, the determination of the merits of the defense in that forum.

19. Class representative American Sales is hereby awarded $50,000 from the Settlement Fund. Class representative Meijer is hereby awarded $40,000 from the Settlement Fund. These payments are in recognition of the work these plaintiffs undertook in representing the Class, which amount is in addition to whatever monies these plaintiffs will receive from the settlement fund pursuant to the plan of distribution. The Court finds these awards to be fair and reasonable, for the reasons stated in the accompanying memorandum.

20. Subject to the terms set forth in paragraph 12 of the Settlement Agreement, if final approval is reversed, vacated, or otherwise modified on appeal, or if appellate review is sought and on such review final judgment is reversed, vacated, or modified, the Settlement Agreement shall be terminated upon the election of either (a) Plaintiffs, through Class Counsel, or (b) GSK.

21. In the event the Settlement does not become final in accordance with the terms of the Settlement Agreement, this final order and judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement. The Settlement Fund, inclusive of any interest, shall be repaid to GSK. However, the costs of notice and administration validly disbursed and paid for from the Settlement Fund need not be repaid to GSK.

22. The Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties and to the Released Parties. Without limiting the generality of the foregoing, each and every covenant of and agreement in the Settlement Agreement by the plaintiffs

758

and their counsel shall be binding on each member of the Class.

23. The Court hereby directs that this judgment of dismissal be entered by the clerk forthwith pursuant to Federal Rules of Civil Procedure 54(b). The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the plaintiffs and the Class against Defendant in the Actions, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to Class members.